```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/27/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

EURO TRUST TRADING S.A.,

                  Plaintiff,

-v.-

ALLGRAINS U.K. CO.,

                  Defendant.

------------------------------------------------------------x

09 Civ. 4483 (GEL)

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

    Plaintiff Euro Trust Trading S.A. commenced this action on May 11, 2009, to invoke the remedy of maritime attachment and garnishment afforded by Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.  On May 14, 2009, after reviewing plaintiff's verified complaint and attorney affidavit and determining that the conditions set forth in Rule B appeared to exist, this Court issued an ex parte Order for Process of Maritime Attachment and Garnishment.  The Order authorized the attachment of defendant Allgrains U.K. Co.'s assets in an amount up to and including $922,099.62.  Despite daily service of the Order, however, none of defendant's assets have been attached.  Plaintiff now requests that the Order be renewed for an additional 60 days.  Defendant, however, moves pursuant to Rule E(4)(f) to vacate the order of attachment on the ground that plaintiff has failed to demonstrate the existence of a valid prima facie admiralty claim.  For the reasons set forth below, both applications will be denied.

### BACKGROUND

    Plaintiff Euro Trust Trading S.A. ("Euro Trust") is a foreign corporation organized and existing under the laws of Switzerland, with a principal place of business in Fribourg,

Switzerland. (Compl. ¶ 2.) Defendant Allgrains U.K. Co. ("Allgrains") is a foreign corporation organized and existing under the laws of England, with a principal place of business in London, England. (Id. ¶ 3.)

On August 27, 2008, Euro Trust and Allgrains entered into a contract pursuant to which Euro Trust was to sell to Allgrains 6,400 metric tons of Russian milling wheat. (Id. ¶ 4.) According to the terms of the contract, the wheat was to be delivered by Euro Trust CIFFO Samsun, Turkey in two separate shipments of 3,200 metric tons each. (Id.) Although the wheat was to be shipped aboard the "M/V LUCKY TRADER," of which Euro Trust was the charterer, between September 1, 2008, and September 30, 2008 (id.), the contract obligated Allgrains to discharge the wheat at the rate of 1,000 metric tons per day, Saturday, Sundays, and holidays excluded. (Id. ¶ 5.) It further required Allgrains to pay Euro Trust demurrage "as per charter party," thus incorporating the terms of the charter party entered into by Euro Trust and non-party ship owners Silver Knot Shipping Ltd., which provided for demurrage payments at the rate of $4,000.00 per day.[1] (Id.)

While Euro Trust shipped the wheat from Russia to Turkey in accordance with the terms of the contract, discharge of the wheat was interrupted on October 7, 2008, due to alleged damage to the wheat. (Id. ¶¶ 6-7.) As of April 23, 2009, the outstanding demurrage totaled $789,550.00. (Id. ¶ 10.) Given that discharge of the wheat has not yet resumed, the damaged wheat remains onboard the vessel and demurrage continues to accrue. (Id. ¶¶ 8, 10, 12.)

---

[1] "Demurrage is defined under maritime law as a liquidated penalty owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by a certain time." Crossbow Cement SA v. Mohamed Ali Saleh Al-Hashedi & Bros., No. 08 Civ. 5074, 2008 WL 5101180, at *1 (S.D.N.Y. Dec. 4, 2008), citing Black's Law Dictionary (7th ed.).

In accordance with the contract's requirement that all disputes be submitted to arbitration in London under GAFTA arbitration rules, Euro Trust commenced arbitration on or about March 20, 2009, by appointing its arbitrator and calling upon Allgrains to do the same. (Id. ¶ 14.) On or about March 25, 2009, Allgrains also appointed an arbitrator. (Id.) The arbitration proceedings are currently ongoing.

On May 11, 2009, Euro Trust commenced this action. On May 14, 2009, on plaintiff's request, this Court issued an ex parte Order for Process of Maritime Attachment and Garnishment in the amount of $922,099.62. Despite daily service of the Order, however, none of Allgrains' property has been restrained. (LeVasseur Aff. ¶ 3.)

On June 26, 2009, Allgrains moved pursuant to Supplemental Rule E(4)(f) to vacate the Order for Process of Maritime Attachment and Garnishment on the grounds that Euro Trust has not asserted a prima facie admiralty claim. On July 10, 2009, Euro Trust requested that the Order – which by its own terms expired in 60 days if no funds were attached – be renewed for an additional 60 days.

## DISCUSSION

I.  **Motion to Vacate**

Pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules"), where a plaintiff files a verified complaint praying for attachment and an "affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district," Supplemental Rule B(1)(b), a "court must enter an order authorizing the attachment, which the plaintiff may then serve on any persons in possession of the defendant's property located within the district." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 438 (2d Cir. 2006). Once its property is

3

restrained, a defendant is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted." Supplemental Rule E(4)(f).[2] To defend the propriety of the attachment, a plaintiff must demonstrate that "1) [it] has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli, 460 F.3d at 445. Where a plaintiff lacks a valid prima facie admiralty claim, its request for relief pursuant to Rule B must be denied for lack of subject matter jurisdiction. See Kalafrana Shipping Ltd. v. Sea Gull Shipping Co. Ltd., 591 F. Supp. 2d 505, 507 (S.D.N.Y. 2008); see also 28 U.S.C. § 1333(1). The plaintiff is not, however, required to advance full-fledged proof of the merits of its case. Chiquita Int'l Ltd. v. MV Bosse, 518 F. Supp. 2d 589, 597 (S.D.N.Y. 2007).

Here, the parties are in agreement that the only issue for decision is whether plaintiff has alleged a prima facie admiralty claim against defendants. To resolve this matter, however, the Court must first decide what law applies. Defendants argue that English law, which is the law of the contract, governs whether plaintiff has a prima facie admiralty claim. (D. Mem. 4-8.) Plaintiff, however, contends that the determination is governed by federal law. (P. Opp. 7-11.)

---

[2] Defendants here moved to vacate the Order even though no property had yet been attached. Rule E(4)(f) provides that a defendant is "entitled to a prompt hearing" on the propriety of an attachment "[w]henever property is arrested or attached," and no other rule specifically provides an avenue for a defendant to challenge the validity of an order permitting attachment before any property is seized. But there is no reason to conclude that the Rule is intended to require a defendant who becomes aware of an attachment before its property is actually seized must wait to suffer an actual deprivation of the use of its property before challenging the legality of an attachment (although the "prompt hearing" requirement may not apply in the absence of the exigency caused by an actual seizure of property.) Since Rule B attachments are typically obtained ex parte, Rule E appears simply to assume that defendants will not become aware of an attachment order until their property is seized.

While some courts in this district have concluded that whether a complaint pleads a valid prima facie admiralty claim is "a question of substantive law," Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 536 (S.D.N.Y. 2007),[3] "the better view is that federal law governs all questions concerning the validity of a Rule B attachment." Harley Mullion & Co. Ltd. v. Caverton Marine Ltd., No. 08 Civ. 5435, 2008 WL 4905460, at *2 (S.D.N.Y. Aug. 7, 2008); see also Reibor Int'l, Ltd. v. Cargo Carriers (KACZ-CO), Ltd., 759 F.2d 262, 265 (2d Cir. 1985) ("Federal law generally governs questions as to the validity of Rule B attachments."). As explained in Harley Mullion & Co. Ltd. v. Caverton Marine Ltd.:

> If, in order to comply with the requirements set forth in *Aqua Stoli*, a claim must be valid under the substantive law that will govern the underlying action, parties initiating or responding to a Rule 4(E) challenge would be routinely required to litigate issues of foreign law and courts would have to probe into the merits of the underlying claim. This sort of detailed examination is inappropriate at a Rule 4(E) hearing as it would undermine the prima facie standard and is at odds with the 'limited inquiry contemplated by *Aqua Stoli*.'

Harley Mullion, 2008 WL 4905460, at *2, quoting Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V., No. 07 Civ. 3076, 2007 WL 1989309, at *3 (S.D.N.Y. July 6, 2007).

---

[3] In light of this conclusion, the Sonito court noted that "[t]he existence *vel non* of a valid maritime claim for purposes of a Rule B writ of attachment turns upon the applicable substantive law, in this case the law of contract." 478 F. Supp. 2d at 536. Because the charter party at issue was governed by English law, the court also used English law to determine whether the claim asserted was maritime in nature. See id. at 543; see also Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd., No. 07 Civ. 8325, 2008 WL 3172998, at *2 (S.D.N.Y. July 31, 2008) (applying English law to determine whether a contingent indemnity claim for breach of a charter party constituted a valid prima facie admiralty claim); cf. Kulberg Finances Inc. v. Spark Trading D.M.C.C., No. 09 Civ. 792, 2009 WL 1726284, at *3, 6 (S.D.N.Y. June 18, 2009) (applying federal law to determine whether the court could exercise admiralty jurisdiction over plaintiff's claim, while applying English law – the law governing the relevant contract – to determine the existence of a valid prima facie admiralty claim for purposes of a Supplemental Rule E(4)(f) motion to vacate).

At any rate, defendants argue not that plaintiff's claim – essentially, a simple claim for breach of contract – is not legally valid, but rather that its claim is not, under English law, a *maritime* claim. But whether a claim is properly considered a maritime claim for purposes of the applicability of Rule B is a purely procedural issue, and thus is governed by federal law irrespective of the law to be applied to any underlying claims. See Harley, 2008 WL 4905460, at *2; T & O Shipping, Ltd. v. Lydia Mar. Shipping Co., S.A., 415 F. Supp. 2d 310, 314 (S.D.N.Y. 2006) ("Rule B is procedural in nature and when a party brings a Rule B attachment in this district, questions about its validity are governed by federal law."). In particular, Rule B provides a specific procedural remedy, not available in other federal civil cases, in cases that are within the jurisdiction of the federal court because of their maritime nature. The availability of the remedy thus turns on the nature of the federal jurisdiction over the case. Whether a case falls within the scope of the federal Supplemental Rules for Maritime and Admiralty Claims is manifestly a question of United States federal law calling for the interpretation of procedural rules adopted by the United States. See id. Rule A. It does not matter how the case would be characterized under the law of some other country, even if that country's law provides the rules governing the substance of the claim.

Under federal law, it is well-established that to determine whether a claim is maritime in nature, a court must assess "whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc., 413 F.3d 307, 312 (2d Cir. 2005). Where a dispute sounds in contract, a court also considers the "nature and character" of the relevant contract to determine "whether it has 'reference to maritime service or maritime transactions.'" Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 24 (2004)

(quotation omitted); see also Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 49 (2d Cir. 2008) (noting that a maritime contract is identified by determining "whether the principal objective of [the] contract is maritime commerce").

Although a contract for the sale of goods is not converted to a maritime contract solely because the subject goods are transported on a ship, see Aston Agro-Industrial AG v. Star Grain Ltd., No. 06 Civ. 2805, 2006 WL 3755156, at *3 (S.D.N.Y. Dec. 20, 2006), such a contract may fall within a court's admiralty jurisdiction where "'the claim [at issue] arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract.'" Folksamerica, 413 F.3d at 314, quoting Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 555 (2d Cir. 2000).[4] Consistent with this principle, courts have held claims for demurrage to be quintessentially maritime in nature and severable from any underlying purchase and sale agreement. See Stemcor UK Ltd. v. Sesa Int'l Ltd., No. 09 Civ. 1155, 2009 WL 1424008, at *2 (S.D.N.Y. May 18, 2009) (noting that contractual provisions like the demurrage clause at issue in this case "implicate[] the fundamental interest of maritime jurisdiction, which is to protect maritime commerce"); Crossbow Cement SA v. Mohamed Ali Saleh Al-Hashedi & Bros., No. 08 Civ. 5074, 2008 WL 5101180, at *1, 5-7 (S.D.N.Y. Dec. 4, 2008); Noble Resources S.A. v. Sarl Ouest Import, No. 08 Civ. 3587 (S.D.N.Y. Aug. 12, 2008) (Tr. of Aug. 12, 2008, at 15-20.); Centramet Trading S.A. v. Egyptian Am. Steel Rolling Co., No. 07 Civ. 6379, 2007 WL 5731922, at *1-2 (S.D.N.Y. Sept. 28, 2007) (concluding that plaintiff had a valid prima facie admiralty claim against defendant where plaintiff alleged that

---

[4] This is one of "two exceptions to the general rule that 'mixed' contracts fall outside admiralty jurisdiction." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 109 (2d Cir. 1997).

defendant breached its obligation to pay demurrage under the terms of a contract for the sale of steel scrap).

In Crossbow Cement SA v. Mohamed Ali Saleh Al-Hashedi & Brothers, for example, the court concluded that a claim arising from a contract for the sale of approximately 25,000 metric tons of cement was maritime in nature. 2008 WL 5101180, at *1, 5-7. In reaching this conclusion, the court noted that the sales contract not only "provide[d] that the discharge rate was 'as per 'Gencon' C/P [i.e., Charter Party] terms,'" but also included a demurrage clause requiring payment in the amount of "US$20,000 per day or prorata, payable every 3 days in advance." Id. at *1 (alteration in original). Because "[p]laintiff's claim [arose] solely from the demurrage clause, which [was] severable from the rest of the Sales Contract and Amendment," and because "[t]he principal objective of the demurrage clause was maritime commerce, as it effectively required the buyer to indemnify the seller for demurrage owed to the shipowner," plaintiff had a valid prima facie admiralty claim. Id. at *7; see also Noble Resources, No. 08 Civ. 3587 (Tr. of Aug. 12, 2008, at 20) ("Far from being attenuated from the business of maritime commerce, . . . calculation of demurrage . . . [is] intimately connected to the business of maritime commerce.")

In light of this precedent, plaintiff has demonstrated that it has a valid prima facie admiralty claim. Far from a contract for the mere sale and purchase of Russian milling wheat, the contract specifies the rate at which demurrage accrues and assigns liability for that demurrage to defendant. Plaintiff's claim arises solely from this demurrage clause, which is severable from the rest of the sales contract. Moreover, it cannot be disputed that "[t]he principal objective of the demurrage clause was maritime commerce, as it effectively required the buyer to indemnify the seller for demurrage owed to the shipowner." Crossbow, 2008 WL

8

5101180, at *7.[5]

Accordingly, because plaintiff's claim is based on the breach of a maritime obligation severable from the remainder of the purchase and sale contract, it therefore constitutes a valid prima facie admiralty claim.

## II. Extension of the Order for Process of Maritime Attachment and Garnishment

Although plaintiff has not yet restrained any of defendant's property, it requests permission to continue serving the Order for Process of Maritime Attachment and Garnishment for an additional 60 days. (LeVasseur 7/10/09 Ltr.) This application will be denied.

The Order for Process of Maritime Attachment and Garnishment issued on May 14, 2009, expressly provided that it would expire 60 days after the date of entry if no funds were attached. As plaintiff acknowledges, despite daily service of the Order on numerous garnishees, it has located no property of defendant in this district during the pendency of the Order, which therefore expired by its own terms on July 13, 2009.

The Order provides the opportunity for an additional 60-day extension where "counsel submits an affidavit establishing good cause" for the extension. However, the boilerplate affidavit submitted in support of plaintiff's application does not satisfy that standard. The affidavit simply asserts:

---

[5] Aston Agro-Industrial AG v. Star Grain is not to the contrary. In Aston, the contract at issue did not assign liability for demurrage to the defendant. See 2006 WL 3755156, at *1. Instead, it "merely set forth the rate at which any demurrage charge would be calculated should it occur." Id. at *4. While the arbitration panel that adjudicated the parties' claims agreed that the plaintiff was entitled to recover demurrage, its decision was based not on the breach of any maritime obligation incorporated in the contract, but instead on the fact that the sale of the goods was on C.I.F. Free Out terms and the risk of loss therefore passed to the buyer (defendant) at the time of shipment. Id. Unlike in Aston, the contract at issue in this dispute expressly obligates defendant to pay any demurrage arising from the shipment of the goods being sold.

> Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within the Southern District of New York and subject to the jurisdiction of this Court, held in the hands of . . . garnishees within this District, which are believed to be due and owing to the Defendant. Plaintiff has conducted investigations into Defendant's commercial activities and believes in good faith that Defendant is presently engaging in U.S. dollar transfers in New York.

(LeVasseur Aff. ¶ 7.) Plaintiff also notes that "the subject contract at issue in the dispute required payments in U.S. dollars." (Id. ¶ 8.)

Plaintiff provides no evidence suggesting that any of defendant's property is or will be found in this district, or making it likely that continued service of the order of attachment will prove any more successful in the next 60 days than it was in the preceding 60 days. While the affidavit states that plaintiff has conducted an investigation into defendant's commercial activities, it provides no details of the nature of that investigation, much less any indication of what the investigation may have unearthed. In the absence of any supporting evidence, the assertion that defendant's property will be found in the district is wholly conclusory and unpersuasive.[6]

---

[6] It must be noted that the attachment authorized by Aqua Stoli is premised on the legal fiction that electronic funds transfers passing through this district constitute property within the district, coupled with a further fiction permitting repetitive service on banks that is deemed to capture such transfers, despite the fact that the transfers are typically not present in the district when the order is obtained or even when service is effectuated, and disappear from the district instantaneously, so that they are no longer present when service is repeated. Given that maritime contracts frequently require dollar-denominated payments, which clear through New York, a plaintiff's initial assertion of a good faith belief that a defendant's property is or will be found in this district, can be accepted, in the absence of contrary evidence. Once experience has demonstrated that such property has not appeared in the district within a reasonable period, there is no further reason to indulge the pyramid of fictions on which the Court's jurisdiction is predicated, or to permit attachment orders to continue in force indefinitely. Absent some more concrete showing that a defendant's property is reasonably expected to appear in the district, there is no basis to extend the term of an attachment order that was granted for a reasonable period of time and that has expired.

10

Under these circumstances, plaintiff has failed to demonstrate good cause for an extension of the May 14, 2009, Order. Its request is therefore denied. Since the putative attachment provides the sole basis for the Court's jurisdiction over this dispute, and no attachment has eventuated, the complaint must be dismissed for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, defendant's motion to vacate the May 14, 2009, ex parte Order for Process of Maritime and Garnishment is denied, plaintiff's request for a 60-day extension of the Order, which has expired by its own terms, is also denied, and the complaint is dismissed.

SO ORDERED.

Dated: New York, New York
       July 24, 2009

*Gerard E. Lynch*
GERARD E. LYNCH
United States District Judge